HORNER *v.* DELLINGER and others.

*Circuit Court, E. D. Wisconsin.* December 1, 1883.)

1. RENT-CHARGE—PARTIAL RELEASE—AFTER EJECTMENT BROUGHT.

The rule of the common law by which the release from a rent-charge of any portion of a tract of land subject thereto discharges all the rest, has no application to a release made after the owner of the rent-charge, either by actual entry upon the land, or by the institution of a possessory action, which is equivalent to entry, has declared a forfeiture for breach of the condition of payment.

2. TAX TITLES—WHAT INTEREST ESTOPS FROM ACQUIRING.

Where land subject to a rent-charge is mortgaged, the mortgagor being bound to pay the rent and taxes, and after the commencement of a suit of foreclosure by the mortgagee, he, or any person for his benefit, purchases the land at a tax sale and receives the tax certificates, but before the tax title is perfected, the mortgagee, to satisfy his decree of foreclosure, takes from the mortgagor a conveyance of the land, subject to the rent-charge, neither he nor the person acting in his interest can, by taking tax deeds in pursuance of the tax certificates already secured, acquire a title paramount to the rent-charge. The institution of the suit of foreclosure places the plaintiff in an incipient contractual relation with the owner of the rent-charge, and this relation, after it has been perfected by a conveyance to him of the land subject to the charge, estops him from ripening into a paramount title the right acquired in the interval under the tax certificates.

3. DEED—CONSTRUCTION—INCONSISTENT STIPULATIONS.

Where a deed conveying two parcels of land stated in terms that the conveyance was upon the express condition that a certain sum should be paid annually as a rent-charge on the larger lot, but provided in a subsequent clause that upon default in the payment of such rent the grantor might enter upon all the land so conveyed except the smaller lot, *held*, that the former stipulation, though standing alone it would give the grantor the right to recover both lots for nonpayment of the rent, was controlled by the subsequent provision, which, upon any other construction, would be insensible.

4. STATEMENT OF THE CASE.

The owner of two parcels of land, containing respectively two acres and a half-acre, conveyed both by a single deed, which stated (without confining the stipulation to the two-acre lot) that the conveyance was upon express condition that a certain annual sum should be 'paid the grantor as a rent-charge upon

the two-acre lot; and which then went on to provide that in case of non-payment of the rent the grantor should be at liberty to enter upon all the land conveyed *except the half-acre lot.* By several conveyances the rent-charge was transferred to A., and the two lots of land to B.; so that A. and B. stood in the shoes of the original grantor and grantee respectively. B. sold the two lots, subject to the rent-charge, to C., who mortgaged them back to secure the purchase money, but C. went into possession, agreed to pay the taxes, and became responsible for the rent. C. failed to pay the purchase money, and B. foreclosed. After the commencement of the foreclosure suit, part of the two-acre tract was sold for taxes, and D., who acted in the interest of B., and had, therefore, only the rights which B. had to purchase the land, bought the land at the tax sale and received tax certificates. Before the tax title was perfected B. took from C. a conveyance of the two lots, subject to the rent-charge, in lieu of his decree of foreclosure. After this, D., still acting in B.'s behalf, received the tax title for the parts of the two-acre tract for which he held tax certificates. B. thereupon ceased to pay rent to A., who brought ejectment to recover possession of both lots for breach of condition. E. at this time owned or claimed a part of the two-acre lot. He was therefore made a defendant in the ejectment, but A. subsequently discontinued the suit with respect to E., and released the part of the land claimed by him from the rent-charge. *Held,* that A. was entitled to recover possession of the whole of the two-acre lot except the part released to E., but not of the half-acre.

This was an action of ejectment, to recover the possession of certain lands and water-power in the county of Fond du Lac, in this state. On the twenty-first day of March, 1851, Mary Eleanor Watson, being the owner under title from the United States of the premises in question, by her attorney, duly authorized, executed to one David P. Mapes an instrument of conveyance which contained the following provisions: That—

"Whereas, the said David P. Mapes has, by virtue of a certain contract * * * made on the seventeenth day of November, A. D. 1848, by and between the parties to this indenture, erected on the east half of the north-west quarter and the west half of the north-east quarter of section twenty-one, in town sixteen north, of range fourteen east, and on a certain water-course running through the same, (known as Green Lake inlet,) a flouring-mill and dam, with the appurtenances thereto, and raised a pond thereon    Now, therefore, for the purpose of fully carrying out, perfecting, and consummating said agreement in its spirit and intent,—except that so much thereof as relates to or creates a joint tenancy in the water-power is hereby rescinded,—this indenture witnesseth: that the said party of the first part, for and in consideration of the sum of one dollar to me in hand paid, * * * and for the further consideration that the premises and easements hereinafter described and herein conveyed be used for the purpose of improving and appropriating the water of the stream running through the tracts of land above described, by the erection of dams, ponds, mills, factories, and other machinery, and applying such water-power thereto; and for the further consideration of the limitations or conditions hereinafter mentioned,—have granted, bargained, sold, released, and confirmed * * * unto the said party of the second part, his heirs and assigns, forever, subject to the limitations or conditions hereinafter expressed and set forth, all and entire, the water-power of said stream on said lands above described, without limit, restriction, or reservation, (except the limitation or condition forming the partial consideration of this indenture:) provided, however, that in the use of the said water, said Mapes, and his heirs and assigns, are to be confined to the south side of the stream, excepting the case of the pond hereinbefore mentioned, which is to remain as at present, and excepting the case of a pond hereafter to be raised by the erection of a dam on the half-acre of land hereinafter described.'"

Then followed words of grant, "for the consideration aforesaid," conveying a certain parcel of land described by metes and bounds, and containing half an acre of land, "together with the privilege and right to overflow so much of the lands of the said party of the first part above the half-acre aforesaid, on the stream, as may be necessary to enable the said party of the second part to use all the fall on said stream between the said half-acre and the eastern line of the N. W. ¼ of S. W. ¼ of section 22, of the town aforesaid."

The conveyance then granted and conveyed another parcel of land, "for the consideration aforesaid," described by metes and bounds, containing two acres, "parcel of the tracts of land first * * * described, on which the aforesaid flouring-mill stands."

The *habendum* clause was as follows:

" To have and to hold, all and singular, the said premises above described, with the appurtenances, and the said easements and privileges, unto the said party of the second part, his heirs and assigns, forever, subject to and yielding and paying to the said party of the first part, her certain attorney, heirs, executors, administrators, or assigns, the annual sum of $205, in quarterly payments, forever, as an annual rent-charge on the said two acres of land above described, with the mill erected thereon, and appurtenances, as hereinafter mentioned."

Covenants of seizin and warranty, and against incumbrances, followed the *habendum* clause, and the conveyance then proceeded as follows:

" Now, this indenture is upon this express condition or limitation, anything herein contained to the contrary notwithstanding: that the said party of the second part, for himself, his heirs, executors, administrators, and assigns, shall and does hereby covenant, bargain, and agree with the said party of the first part to pay, or cause to be paid, at Ripon, aforesaid, to the said party of the first part, her certain attorney, executors, administrators, or assigns, the sum of $183.75 on the first day of January, A. D. 1852, and thereafter the sum of $205, annually, forever, to be paid in quarterly payments of $51.25 on the first days of April, July, and October in the year 1852, and on the first days of January, April, July, and October in each and every year thereafter, forever; which said sum is hereby created and made an annual *rent-charge*, according to the meaning thereof at the common law, to be and remain upon the said two acres of land above described and conveyed. and upon the water-power used and to be used thereon, and upon all the mills, buildings, and fixtures attached or to be attached thereto or erected thereon *in perpetuity.* And the said party of the second part, for himself, his heirs, executors, administrators, and assigns, does covenant, bargain, and agree to and with the said party of the first part that if it shall so happen that the rent above reserved, or any part thereof, shall be behind and unpaid by and for the space of six months after the days of payment above specified, or next after any payment shall be due according to the above covenant, then and in such case, and from thenceforth, and at all times thereafter, it shall be lawful to and for the said party of the first part, her heirs, executors, administrators, or assigns, into the whole of the hereby bargained, sold, and demised premises, and into every and any part thereof, excepting the half-acre of land hereinabove described and conveyed, in the name of the whole to enter, and the same as her and their former estate to have again, possess, and enjoy, and the said party of the second

part, his heirs, executors, administrators, or assigns, and all others, thereout and from thence utterly to expel, put out, and remove, this indenture or anything herein contained to the contrary thereof in anywise notwithstanding."

The contract referred to in the deed was an agreement for the sale to Mapes of the two acres described in the deed as a mill-site, for the purpose of erecting thereon a flouring-mill, together with an appurtenant water-power, and providing for the payment of an annual and perpetual rent-charge of $120. The contract did not contain any provision concerning the half-acre described in the deed, and upon performance of its conditions as therein specified, Mapes was to receive a conveyance of the premises mentioned in the contract, and accordingly, the deed of 1851, the principal provisions of which have been stated, was executed.

In subsequent years, by a chain of mesne conveyances extending from 1851 to 1862, numerous parties successively acquired the rights and interests of Mapes in the premises conveyed to him by the instrument of conveyance of March 21, 1851, and in 1862, 1864, and 1865 the defendant Dellinger became the owner, subject to the terms of the rent-charge deed.

In 1864, Mary Eleanor Watson executed to Harriet L. Horner an instrument of conveyance by which, among things, she conveyed to the grantee named, all and every right, power, and authority, claim, demand, and interest, she, the grantor, had under the deed to Mapes of March 21, 1851, with the right to demand, sue for, and recover all rents under said deed, and all other claim and interest that might accrue thereunder by a forfeiture thereof.

In 1869, Dellinger and wife conveyed the premises which may be mentioned as the two-acre tract and the half-acre tract, subject to the terms of the rent-charge deed to one Shepard, who, to secure the payment of the purchase money, executed back to Dellinger a bond in the sum of $40,000, secured by a mortgage on the premises so conveyed. Shepard entered into possession and continued to hold the title until June 16, 1879. In 1876 a suit to foreclose the mortgage was begun by Dellinger against Shepard and others, and in January, 1879, a decree of foreclosure was entered, but no sale was made under the decree. In lieu thereof, Shepard and wife, on June 16, 1879, reconveyed the premises to Dellinger by quitclaim deed.

In 1881, Dellinger conveyed to the defendant Cole a part of the two-acre tract, but this conveyance did not include any part of the water-power.

On the eleventh day of January, 1882, Harriet L. Horner conveyed the premises in question, by quitclaim deed, to the plaintiff, William H. Horner, and on the same day, by written instrument, assigned and transferred to him all claims, rights of action, and demands against the defendants, or either of them, growing out of their omission to pay the rent reserved in the deed of 1851, so that the

plaintiff stood in her place as the grantee of Mary Eleanor Watson under the rent-charge deed.

In each of the years 1878 and 1879, and while Shepard held the title and was in possession of said premises, part of the two-acre tract was sold by the county treasurer of Fond du Lac county, for taxes, to the defendant Sutherland, and, the same remaining unredeemed, tax deeds thereof were issued to Sutherland.

At the time the present suit was begun, the defendants Haas and Powers claimed some part of the two-acre tract, but pending the suit, the plaintiff made a settlement with those parties, and conveyed to them by quitclaim deeds those parts of the premises in which they asserted an interest, and thereby released them from all obligation to pay rent under the rent-charge deed. The suit was therefore discontinued as to Haas and Powers, so that the contesting parties in the action were the plaintiff and the defendants Dellinger and Sutherland, and the premises in controversy were those described in the rent-charge deed as the two-acre and the half-acre tracts.

The defendant Dellinger asserted title to the half-acre tract as the owner thereof in fee-simple, and the defendant Sutherland claimed title to the larger part of the two-acre tract under the tax deeds issued to him in 1881 and 1882. It was admitted that no rent had been paid on the property since January 1, 1881. The unpaid rent to that time, due under the rent-charge deed, was paid by Dellinger after he received back the title from Shepard. The present suit was commenced in July, 1882.

*D. H. Johnson* and *Wm. P. Lynde,* for plaintiff.

*D. S. Ordway,* for defendants.

DYER, J. 1. The first question for consideration is, what effect, if any, did the release by the plaintiff of Haas and Powers from the obligation to pay rent for the portions of the premises claimed and possessed by them, as evidenced by the conveyances they received from the plaintiff pending this suit, have upon the rights of the parties? The contention of the defendant is that this release operated to discharge the whole rent-charge and to release all parties therefrom, and therefore to destroy the very basis of this suit. That the deed from Watson to Mapes created a rent-charge, according to the ancient meaning of that term, and as defined in the old books, is clear. "Where a man seized of lands, grants, by a deed poll, or indenture, a yearly rent, to be issuing out of the same land to another in fee, in tail, for life or years, with a clause of distress, this is a rent-charge, because the lands are charged with a distress by the express grant or provision of the parties, which otherwise they would not be. So, if a man makes a feoffment in fee, reserving rent, and if the rent be behind, that it shall be lawful for him to distrain, this is a rent-charge, the word 'reserving' amounting to a grant from the feoffee." 2 Bac. Abr. 452, 453. "A rent-charge is any rent granted out of lands by deed with a clause of distress, whence it derives its

name; because the land is charged with distress by the express provision of the parties, which it would not otherwise be." 1 Crabb, Law of Real Prop. 44; Law Library, (3d Series,) 129. See, also, *Cornell* v. *Lamb*, 2 Cow. 659; *People* v. *Haskins*, 7 Wend. 464; *Van Rensselaer* v. *Hays*, 19 N. Y. 68; *Farley* v. *Craig*, 11 N. J. Law, 262. It is a rule of the common law that a rent-charge, being an entire thing, and issuing out of every part of the estate, cannot be apportioned. Unlike rent service, it is entire and indivisible; and from this property of a rent-charge the law drew the following conclusion: That if any part of the land out of which a rent-charge issued was released from the charge by the owner of the rent, either by an express deed of release or virtually, by his purchasing part of the land, all the rest of the land should enjoy the same benefit and be released also. Williams, Real Prop. 336. "If a person having a rent-charge issuing out of three acres of land releases all his right in one acre, the rent is extinct, because all issues out of every part, and it cannot be apportioned." Brooke, Abr. "Apportionment, 17." "If one having a rent service purchase a part of the land out of which it issues, it extinguishes the rent *pro rata* and leaves it good for the balance. So, if he release a part of his rent, the residue is not discharged. But if it be a rent-charge, and the holder of the rent purchases any part of the premises, the rent is wholly extinct. So, if he releases any part of the land which is charged, the balance is wholly discharged, and the rent will not be apportioned." 2 Washb. Real Prop. 288. In the absence of statute changing this rule of the common law, it would seem, therefore, that if, before suit brought, and while the plaintiff was claiming rent from the various parties under the rent-charge deed, he had released portions of the premises charged with the rent, all would have been released. But after the plaintiff had made entry on the premises for non-payment of rent, or had done that which was equivalent to entry,—after he had declared a forfeiture and asserted his rights, not as a claimant of rent, but as owner of the lands, the common-law principle could have no application. At the time of the settlement with Haas and Powers, the plaintiff was not claiming the rent under the rent-charge deed. He was not seeking to enforce the rent-charge. He was asserting a right to treat the estate as having reverted for breach of the obligation to pay rent. He was claiming as owner of the land. He had brought this suit to recover possession, and that was equivalent to entry for breach of condition. At least, such was the effect of the suit in its relation to his dealings with Haas and Powers. This being so, the common-law rule referred to is inapplicable, and their release from further liability under the rent-charge clause in the deed of 1851, had no effect upon the rights and relations of the other parties in interest.

2. The defendant Sutherland, as it is understood, in behalf of Dellinger, claims title to part of the two-acre tract under the tax deeds previously referred to. It is contended by the plaintiff that

these deeds are inoperative thus to vest the title. One of the tax sales occurred May 14, 1878, and was for the taxes of 1877; the other, May 13, 1879, for the taxes of 1878. Shepard then held the title to the land acquired from Dellinger, and Dellinger's interest was that of a mortgagee. The mortgage was made November 27, 1869, and contained a covenant that the mortgagor would pay all taxes on the mortgaged premises. Dellinger began a foreclosure of the mortgage, January 26, 1877. Shepard, in satisfaction of the foreclosure decree, conveyed to Dellinger by quitclaim deed, June 16, 1879. The tax deeds to Sutherland were executed respectively September 7, 1881, and July 27, 1882. It is admitted that with reference to the tax titles, Sutherland stands in the shoes of Dellinger; that is, that he purchased at the tax sales and obtained the tax deeds for Dellinger's benefit. The question, therefore, really is, could Dellinger, in view of the relation in which he stood to the property, acquire and hold the tax certificates as Sutherland acquired and held them, and could they in his hands be made use of as the basis for valid tax titles in 1881 and 1882? As between Shepard, mortgagor, and Dellinger, mortgagee, it is undoubtedly true that Dellinger was not precluded from becoming the purchaser of the premises at the tax sales and obtaining a paramount title by tax deed. *Sturdevant* v. *Mather,* 20 Wis. 576; *Wright* v. *Sperry,* 25 Wis. 620; *Walthall's Ex'rs* v. *Rives,* 34 Ala. 92; *Williams* v. *Townsend,* 31 N. Y. 415. It is a general principle that estoppel from purchasing a tax title lies only against those who ought to have paid the tax or removed the burden. *Sands* v. *Davis,* 40 Mich. 14; *Blackwood* v. *Van Vleit,* 30 Mich. 118. As is said by Mr. Chief Justice Dixon in *Smith* v. *Lewis,* 20 Wis. 356, in cases where the right to assert a paramount title by tax deed is disputed, the turning point is whether or not the party setting up the tax title was under obligation to pay the taxes.

"If he was under such obligation, either from having been in possession and liable to pay the taxes at the time of the assessment, or from their having been properly assessed against him, or by reason of any covenant or promise to the party against whom he claimed the title, the deed in such cases has been held unavailing."

Says Judge COOLEY, in his Law of Taxation, 348:

"Whether one should be precluded by the naked fact that he claims title to the land, or that he has possession of it, from making a purchase in extinguishment of the right of another with whom he stands in no contract or fiduciary relations, is a question often touched by the discussions of courts, without having as yet been very fully or comprehensively examined. So far as the cases hold that one who ought, as between himself and some third person, to pay the taxes, shall not build up a title on his own default, the principle is clear and well founded in equity. But when one owes no duty to any other in respect to the land, it is not so clear upon what principle of equity or of estoppel such other is to set up, as against him, his neglect to perform in due season his duty to the government."

The general principles thus laid down in the authorities are certainly not to be questioned, and it was strongly urged on the argument, in support of the Sutherland title, that as Dellinger was under no duty or obligation to pay either the rent-charge created by the deed of 1851 or the taxes of 1877 and 1878, at the time of their assessment, or when the tax sales occurred, in 1878 and 1879, because Shepard then held the title to the premises, and was in possession, there was no legal obstacle in the way of his acquiring the tax title, even though it should defeat the conditions of the rent-charge deed. There is force in the proposition, but, in view of the peculiar facts of the case, is it sound? It is observable that Dellinger's original title was subservient to the conditions of the rent-charge deed. Shepard's title and Dellinger's mortgage interest were also subordinate to the rent-charge incumbrance, which, so to speak, inhered in the estate. Not that Dellinger, after he conveyed to Shepard, was under personal obligation to pay the rent, but his interest as mortgagee was subject to the paramount right of the rent claimant. As between himself and Shepard, the latter was bound to pay the taxes; and although there was a third interest involved, I am not prepared to dispute the proposition that Dellinger had the strict legal right for the protection of his mortgage interest to acquire the tax certificates. But his mortgage foreclosure did not proceed to sale. He accepted satisfaction of his mortgage debt by receiving back the title of the premises from Shepard. He thus became restored to his original relations to the property, and his obligation to pay the rent was thereby renewed. He did not re-enter as a stranger to the plaintiff or the plaintiff's grantor. He again stood in contract relations with him. He again held in subordination to the rent-charge. The tax certificates had not yet ripened into title. They were in the hands of his representative. This being the situation, could he then use the certificates for the purpose of obtaining a title, which would have the effect to overreach and cut off a right which had been reserved in perpetuity by the original holder of the title, and thus terminate his voluntarily renewed obligation to pay the rent? It is against equity and right that this result should be thus accomplished. Dellinger's foreclosure was begun before there was any sale of the land for taxes. That foreclosure, resulting only in decree and followed by conveyance from the mortgagor, was a step in his renewed acquisition of just such a title as he had previously held, namely, a title subject to the duty and obligation to pay the rent. The tax deeds were not taken until long after Dellinger's original relations to the property and to the plaintiff's grantor were thus restored. To give him the benefit of a hostile title thus acquired, would be to enable him to avail himself of Shepard's breach of the covenant in the mortgage to pay the taxes, not only against Shepard, but against a third interest, which was the first and original source of title, and to which all successors in title had been made subservient. By taking title from Shepard, Dellinger virtually

took the place of the mortgagor, so far as obligation and title were concerned, and in the light of the renewed relations of Dellinger to the owner of the rent-charge interest, and of the situation of all parties with reference to the property, is must be held that the ownership of the tax certificates by Dellinger, or by Sutherland for Dellinger, after the title passed out of Shepard, operated as a payment of the taxes, and could not be made the foundation of a hostile title by tax deeds in favor of Dellinger, and against the possessor of the rent-charge interest. The state of facts presented here seems to render it highly inequitable, as between Dellinger and the plaintiff, that the tax deeds should prevail as valid muniments of title. Admitting that, as between Shepard and Dellinger, mortgagor and mortgagee, the latter could lawfully acquire the tax certificates, it does not follow, when all the facts are considered, that Dellinger could subsequently, and after a voluntary renewal of his original relations to the property, make use of the certificates to cut off rights to which his title was then subservient. The court being of the opinion, for the reasons stated, that the tax deeds cannot prevail against the plaintiff's superior right, and as it appears that the payment of rent after January 1, 1881, was refused, it follows that the plaintiff is entitled to recover the possession of all that part of the two-acre tract claimed by the defendants Dellinger and Sutherland.

3. There remains to be considered the question of the title to the half-acre tract,—a question, the solution of which depends on the construction of the deed of 1851 from Watson to Mapes. The contention of the counsel of plaintiff is that the deed contains, not a mere limitation, but a condition; that this condition, which is one to pay rent for the two acres, is a condition of the entire conveyance and affects the whole title; that a failure to pay the rent charged upon the two acres avoids the whole grant, including that of the half-acre; in other words, that, as a result of condition broken, the entire grant fails. This view is combated by defendants' counsel, who insists that the rent-charge clause is a mere promise or covenant to pay rent for the two acres; that the deed is not upon any condition affecting the half-acre parcel; and that as to that parcel, the deed conveys an absolute title in fee, untrammeled by the rent-charge clause, or by any condition relating thereto.

In the absence of the clause in the deed giving the right of entry and ouster as to the two-acre tract, there would be no doubt of the soundness of the plaintiff's position. The statement of the consideration in the deed, and the general words of the grant, coupled with the language which declares that the indenture is upon a certain express condition, are adequate to create a condition subsequent, upon which, if those were all the provisions indicative of the intent of the grantor, and the consequent meaning of the instrument, the whole title would necessarily be dependent. Argument is not needed in support of that proposition. The question turns, then, upon the effect

of the clause in the deed providing for re-entry in case of failure to pay rent, and its bearing upon the antecedent provisions declaratory of a condition.

In construing the deed it must be looked at from its four corners. The rent-charge is imposed only on the two acres. It appears as an extrinsic fact in the case that at the time the deed was made, the water-power, appurtenant to the two acres, had been improved by Mapes. A mill and dam were constructed on that parcel of land in 1849, after the making of the contract which preceded the deed. There were no improvements on the half-acre in 1851. The clause giving the right of re-entry contained a covenant by the grantee that if it should happen that the rent reserved,—that is, the rent for the two acres,—or any part of it, should be behind and unpaid for the space of six months next after the day of payment, or next after any payment should be due according to the covenant, "then and in such case, and from thenceforth, and at all times thereafter, it shall be lawful to and for the said party of the first part, her heirs, executors, administrators, or assigns, into the whole of the hereby bargained, sold, and demised premises, and into every or any part thereof, *excepting the half-acre of land hereinbefore described and conveyed*, in the name of the whole to enter, and the same as her and their former estate to have again, possess, and enjoy; and the said party of the second part, his heirs, executors, administrators, or assigns, and all others, thereout and from thence utterly to expel, put out, and remove, this indenture or anything herein contained to the contrary thereof in anywise notwithstanding."

Although a deed in some of its parts may express a condition which, standing alone, would affect the whole title, there is no doubt that the effect or scope of the condition may be qualified by other clauses, declaratory of certain rights of the parties under the instrument. For what reason the right of re-entry was given as to the two acres and not as to the half-acre, if the half-acre was intended to be embraced within the condition, seems to the court a very significant question. According to the theory of the plaintiff's counsel, the plaintiff has his remedy by ejectment to recover the whole land for breach of the condition relating to the payment of rent for the two acres. If this be so, of what force or effect is the clause giving the right of re-entry except as to the half-acre? Why is that parcel excepted from the operation of that clause? It seems to the court that the contention of the plaintiff renders nugatory all that is said in the deed with reference to the right of re-entry, as to the half-acre, because if the plaintiff is right in his position, notwithstanding the express exception of the half-acre, if the rent is not paid quarterly, the whole estate may be recovered in ejectment, for breach of condition subsequent. Whether the re-entry clause gives a double right of redress or not,—that is, by either actual re-entry or ejectment,—it seems very clear that the language of that clause is broad enough to

include the remedy by ejectment as to the two acres, and that the express exception of the half-acre parcel from the operation of the clause, in effect declared it to be the intent of the grantor that even that form of remedy should not exist as to the half-acre tract; in other words, that the language of this clause can only mean that the plaintiff's remedy, whether in ejectment or by actual re-entry, is limited to the two-acre tract. The effect of this construction of that clause is not to destroy the antecedent provision of the deed which declares the indenture to be upon a certain express condition, but to qualify the operation of that condition, so that the half-acre tract is not embraced within it; and, in the opinion of the court, such is the inevitable effect of the re-entry clause. Giving efficacy to every part of the instrument, it seems to the court that it was the intention of the parties to pass the title to the two-acre tract, upon which the rent charge was imposed, subject to the condition expressed in the deed; and to convey the half-acre tract free from that condition. And this view of their intention appears to be consistent with the situation of the property at the time the deed was made.

As illustrative of the principle of construction here applied, the case of *Dilliard* v. *Connoway*, 25 Miss. 230, cited by defendant's counsel, and called to the attention of counsel for plaintiff since the argument, seems to be quite strongly in point.

But it is contended, in behalf of the plaintiff, that effect may be given to the re-entry clause in the deed that shall be consistent with the application of the condition subsequent to both of the tracts of land in question, by construing that clause as giving the right to re-enter as to the two acres for the purpose of collecting accrued rent, and then surrendering possession and permitting further rent to accrue. Undoubtedly, instead of a condition in an instrument of conveyance giving the grantor a right to enter and defeat the grantee's estate altogether upon non-payment of rent reserved, it may be so framed that the grantor may enter and hold possession until he makes the rent out of the enjoyment of the estate; in which case the land goes back to the grantee or his assigns. * * * And this right to hold for the rent may be defeated at any time by the payment of the balance due. 2 Washb. Real Prop. (4th Ed.) 280, 281. But evidently the re-entry clause, in the conveyance under consideration, was framed with the intention of giving the grantor such a right of entry upon the premises and such recovery of possession as would defeat the whole estate of the grantee or his assigns therein. This is the scope and meaning of the language employed in the clause; and, though the greater right might include the lesser, the primary purpose of the provision for re-entry must prevail.

On the whole, it is the judgment of the court that the plaintiff's recovery must be limited to that part of the two-acre tract claimed by the defendants Dellinger and Sutherland, and the water-power appurtenant thereto.